# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF IDAHO

In Re:

BAIR AUCTION COMPANY, INC.,

Debtor.

**Bankruptcy Case No. 04-40825**

## MEMORANDUM OF DECISION

**Appearances:**

    Kent Higgins, MERRILL & MERRILL, Pocatello, Idaho, Attorney for Ron and Janiece Bair.

    Craig Christensen, Pocatello, Idaho, Attorney for Chapter 7 Trustee.

    L. D. Fitzgerald, Pocatello, Idaho, Chapter 7 Trustee.

On December 15, 2004, the Court conducted a hearing concerning Ronald and Janiece Bairs' objection to Chapter 7 Trustee L.D. Fitzgerald's request to reimburse Prime Time Auctions, Inc. for costs the auctioneer incurred transporting items owned by Debtor Bair Auction Co. Inc., to Pocatello for sale.

MEMORANDUM OF DECISION - 1

The Bairs' objection is based on a stipulation reached in open court between attorneys for Creditor Zions First National Bank, the Trustee, and the Bairs, prior to a hearing concerning the proposed sale. To resolve the Bairs' objection, the Court must interpret that stipulation.[1]

## FACTS

On August 23, 2004, Chapter 7 Trustee L.D. Fitzgerald (Trustee) filed a Notice of Sale in this case wherein he proposed to sell certain assets of Debtor Bair Auction Co., Inc. on September 25 at a public auction. Docket No. 24. For clarity, the Court will refer to the items described in this Notice as the "Pocatello items." The Notice provided that Prime Time Auctions, Inc. ("Prime Time") would conduct the sale, noting that the Court had already approved the Trustee's employment of Prime Time. *See* Docket Nos. 25, 31.

Creditor Zions First National Bank ("Zions"), a creditor claiming a security interest in Debtor's assets, objected to the Notice of Sale, as did Mr. Bair, an alleged co-maker on the Zion's debt. Docket Nos. 32, 33. On September 21, 2004, the Court conducted a hearing on the Trustee's Notice and both objections. The parties were represented by counsel.

---

[1] This Memorandum constitutes the Court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052, 9014.

MEMORANDUM OF DECISION - 2

At the hearing, Zions was concerned that its lien rights in some of the Pocatello items to be sold would not be preserved since the Notice provided the auction was to be "free and clear of all liens." Mr. Bair had a different objection to the sale. He feared the Trustee's auction would not yield the best possible prices, which in turn may leave him responsible to pay a greater portion of Debtor's debt to Zions. Mr. Bair also expressed concern that other assets of the Debtor located in Blackfoot (the "Blackfoot items") were yet to be sold by the Trustee, and if the Trustee held a separate, smaller auction, it may be poorly attended and, as a result, yield lower prices.

After hearing from counsel, the Court suggested that the parties consider including the Blackfoot items in the Pocatello auction rather than selling them separately, speculating that one large, well-advertised Pocatello sale may be better attended and thereby yield higher sale prices. At that point, the Court took a short recess to allow the parties to discuss their options.

When the Court reconvened, counsel for Zions and Mr. Bair agreed to withdraw their objections to the Trustee's Notice based upon a stipulation they had reached with the Trustee. The Court invited the parties to recite the terms of their stipulation on the record, and speaking primarily through the Trustee's attorney, they did.

MEMORANDUM OF DECISION - 3

The parties agreed that the Pocatello auction could go forward as scheduled in the Notice and that Zions and the Bairs would waive any alleged deficiencies in the Notice. Tr. at 22, line 23– p. 23, line 2, Docket No. 53. In addition, they agreed that the terms contained in a proposed letter agreement dated September 9, 2004, sent by counsel for the Trustee to Zions' attorney, would be included in their stipulation, except that there would no longer be a second sale of the Blackfoot items as the letter contemplated. Obj., Attach., Docket No. 49; Tr. at 23, lines 3–18. Instead, the parties agreed the Blackfoot items would be transported to Pocatello, included in the auction, and the Notice would be deemed to encompass those items as well. Tr. at 23, lines 3–13. The Trustee agreed that he would arrange to transport the Blackfoot items to Pocatello. Tr. at 23, lines 12–13. The Trustee's counsel read the remainder of the parties' stipulation into the record as follows:

> [T]he sale scheduled for September 25, 2004 will be conducted by Prime Time Auction. Any pre-petition liens of Zions First National Bank will attach to the net sale proceeds. Prime Time Auction will be paid, subject to U.S. Bankruptcy Court approval, the commission of 10 percent of the gross sale proceeds. *Prime Time Auction will be reimbursed from the gross sale proceeds subject to U.S. Bankruptcy Court approval its actual costs and expenses which will be itemized and will be less than $2,000.* L.D. Fitzgerald will be authorized to liquidate and sell at public

MEMORANDUM OF DECISION - 4

> auction the various items of inventory and equipment belonging to Bair Auction Company [that] the trustee recently discovered in Blackfoot, Idaho, and those are the items we're talking about bringing down to Pocatello. Any pre-petition liens of Zions First National Bank would attach to the net sale proceeds. Prime Time Auction then would be paid subject to Bankruptcy Court approval and reimbursed subject to Bankruptcy Court approval.

Tr. at 23, line 14– p. 24, line 12 (emphasis added).[2]

When the attorneys had concluded reciting their stipulation, the Court announced that its terms would be deemed binding upon the parties. The Court asked the Trustee's counsel if there was anything else to add, to which he replied, "No." Tr. at 25, lines 21–23. The Court also directed the Trustee's counsel to submit a form of order for entry by the Court that incorporated the parties' agreement, which form of order was to be approved by all counsel. The hearing was then adjourned.

Apparently, the Trustee's counsel drafted a form of order for review by the other lawyers. That draft contained provisions allowing the Trustee to reimburse Prime Time for expenses related to selling the Pocatello items in an amount not to exceed $2,000, as previously agreed by the parties. However, the

---

[2] It was apparent that the Bairs' counsel had not seen a copy of the September 9 letter from the Trustee's lawyer to Zions' counsel prior to the hearing. *See* Tr. at 26, lines 17–21.

MEMORANDUM OF DECISION - 5

draft also provided that the Trustee could pay Prime Time up to $3,500 for expenses to transport the Blackfoot items to Pocatello for sale. Zions approved the form of order; the Bairs did not. It was the Bairs' view that the parties' oral stipulation established a cap of $2,000 for reimbursement of any of the auctioneer's expenses, regardless of whether those expenses related to the Pocatello items or to the Blackfoot items. The Trustee elected to proceed with the September 25 Pocatello auction despite the absence of a Court order approving the sale or memorializing the parties' agreement.

On October 19, Prime Time applied for approval of its compensation for conducting the auction in the amount of $8,522.75, and for reimbursement of its expenses for advertising the sale in the amount of $1,711.01. Docket No. 40. No objections were made to this application and the Court approved it. Docket No. 48.[3]

On November 1, the Trustee filed and served a notice of hearing indicating he intended to request Court approval to reimburse Prime Time for an

---

[3] The Court's order also approved compensation and advertising expenses from a separate sale conducted by Prime Time in Gooding on October 2, 2004. *See* Docket No. 41. The amounts approved by the Court's order actually combine the figures from these two auctions, and approve expenses totaling $1,807.04.

MEMORANDUM OF DECISION - 6

additional $6,517.00 in expenses for the Pocatello sale.[4] The Bairs filed an objection to the Trustee's request. Docket No. 49. In it, they contend the parties' September 21 in-court oral stipulation limits the Trustee's right to reimburse Prime Time for expenses to a sum not to exceed $2,000 for the Pocatello auction. The Bairs argue that the stipulation made no provision for reimbursement of costs for transporting the Blackfoot items to Pocatello in excess of this amount. The Trustee disagrees. He contends that the parties' stipulation was intended to cap reimbursement of Prime Time's expenses attributable to the Pocatello items at $2,000, but that all understood there would be an additional $2,000 in expenses allowed for the costs of transporting the Blackfoot items to Pocatello.

## DISCUSSION

The Court has repeatedly stressed the importance of strict compliance with the terms of stipulations negotiated by parties in the context of contested bankruptcy proceedings. *In re AICO Recreational Props., LLC*, 03.2

---

[4] While the Court did not address it at the hearing, in reviewing the record it appears that neither the Trustee nor Prime Time has ever filed an application for approval of payment of these expenses, nor has Prime Time submitted an itemization of the specific expense items. This is a defect that must be corrected in advance of any Court approval of reimbursement to Prime Time in any amount. At the hearing, counsel for the Trustee represented that approximately $2,000.00 of his request related to the Pocatello items, and $4,500.00 related to transporting and preparing the Blackfoot items for sale. Neither of the parties challenged Counsel's representations.

MEMORANDUM OF DECISION - 7

I.B.C.R. 105, 107 (Bankr. D. Idaho 2003); *In re Blele*, 03.1 I.B.C.R. 85, 86 (Bankr. D. Idaho 2003); *In re Bish's Boys, LLC*, 02.1 I.B.C.R. 6, 7 (Bankr. D. Idaho 2002). It is critical to the efficient operation and integrity of the bankruptcy case that all be able to rely upon the binding nature of agreements made during the course of bankruptcy proceedings. That the parties' stipulation here was not reduced to writing is of no moment; the parties agreed to be bound by their oral agreement without condition, and the Court deemed their agreement to be binding even in the absence of any formal, written order. *See AICO Recreational Props., LLC*, 03.2 I.B.C.R. at 107 (holding that an oral stipulation recited by parties in open court is enforceable despite the parties' intent to reduce their agreement to writing and their subsequent failure to do so). Neither the Trustee nor the Bairs challenge this fundamental principal. Instead, they disagree about the terms of their agreement respecting reimbursement of Prime Time's expenses.

An agreement to settle a legal dispute is a contract, and its interpretation and enforcement are governed by familiar principles of contract law. *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989). The applicable law is Idaho state law. *Id.* Under Idaho law, the interpretation of a contract's meaning

> begins with the language of the contract. "If the
> contract's terms are 'clear and unambiguous,' the
> determination of the contract's meaning and legal

MEMORANDUM OF DECISION - 8

> effect are questions of law . . . and the meaning of the contract and intent of the parties must be determined from the plain meaning of the contract's own words." If, however, the contract is determined to be ambiguous, "the interpretation of the document is a question of fact which focuses upon the intent of the parties."

*McKay v. Boise Project Bd. of Control*, No. 28660, 2004 WL 1631158 at *6 (Idaho Jul. 22, 2004) (quoting *Albee v. Judy*, 31 P.3d 248, 252 (Idaho 2001)). The initial inquiry into whether a contract is ambiguous presents a legal question for the Court, and to answer that question, the Court must examine whether the terms of the contract are reasonably susceptible to conflicting interpretations. *DBSI/TRI V v. Bender*, 948 P.2d 151, 157 (Idaho 1997); *USA Fertilizer, Inc. v. Idaho First Nat'l Bank*, 815 P.2d 469, 472 (Idaho Ct. App. 1991) (holding a contract was ambiguous if its terms "reasonably can be read to accommodate either of the conflicting interpretations urged by the parties."). If the terms are so susceptible, the contract is considered ambiguous, and the court should resort to extrinsic evidence to determine the parties' intent. *Elliott v. Darwin Neibaur Farms*, 69 P.3d 1035, 1040 (Idaho 2003); *USA Fertilizer, Inc.*, 815 P.2d at 275. When interpreting any provision of a contract, the contract must be considered as a whole and in its entirety to ascertain the mutual intent of the parties at the time the

MEMORANDUM OF DECISION - 9

contract was made. *Win of Michigan, Inc. v. Yreka United, Inc.*, 53 P.3d 330, 333 (Idaho 2002); *First Sec. Bank of Idaho v. Murphy*, 964 P.2d 654, 658 (Idaho 1998).

Here, the terms of the parties' stipulation is embodied in their oral recitations made in open court during the September 21 hearing, coupled with those found in the September 9, 2004, letter from the Trustee's attorney to Zion's attorney. However, in comparing the terms expressed in the letter to those recited in the courtroom, it is apparent they differ in some important details. The Court's challenge is to interpret and reconcile these differences.

The letter clearly contemplates that the Trustee would conduct two auctions: one in Pocatello on September 25, and one in Blackfoot on October 1. The terms relating to the Pocatello auction are found in paragraphs 1–4 of the letter. As pertinent here, those provisions specify that Prime Time will be paid a 10% commission on the gross sale proceeds, plus receive reimbursement of actual costs it incurs, which "will be less than $2,000." Obj., Attach., Docket No. 49. Separate terms in paragraph 5 of the letter address the proposed Blackfoot auction. This paragraph also provides for a 10% auctioneer's commission, and it also provides that Prime Time's actual expenses incurred in relation to the Blackfoot auction will be reimbursed, but the letter does not specify any amount for these costs. *Id.*

MEMORANDUM OF DECISION - 10

In contrast, at the hearing, to settle their dispute, it was clear the parties, through their oral stipulation, contemplated that the Trustee would conduct a single auction in Pocatello. Indeed, it was the Court that suggested to the parties that there may be advantages to selling Debtor's assets in one, widely-advertised, well-attended public auction. In agreeing to this approach, it is obvious the parties were not only attempting obtain the highest sales price for the items, but also to minimize the costs associated with liquidating Debtor's assets. This was an especially critical concern to Mr. Bair, who as a co-debtor on the Zions loans, could bear the brunt of either low sales prices or high sales costs. But though they agreed to a "single sale" approach, at the hearing the parties also stipulated that the terms of the letter would also constitute a part of their agreement. Tr. at 23, lines 3–18; p. 25, lines 12–22; p. 26, lines 14–21.

Upon closer review, though, and despite any seeming inconsistency between the terms of the letter and the oral stipulation, when considered as a whole, the parties' agreement is not reasonably susceptible to conflicting interpretations and is therefore not ambiguous. Here's why.

The parties unambiguously agreed there would be but one sale, not two, and that the sale would be held in Pocatello. They also agreed the Blackfoot items would be included in the Pocatello sale. And as to that sale, the Trustee's

MEMORANDUM OF DECISION - 11

attorney specifically recited that the auctioneer's expenses "will be less than $2,000." Tr. at 23, line 25–p. 24, line 2. In this fashion, the parties effectively agreed that the terms applicable to the Pocatello sale would govern.

The terms in the letter relating to a second, Blackfoot sale providing that the Trustee would reimburse the auctioneer's expenses for that sale are of no help to the Trustee. Even if such a second sale were to have occurred, those expenses presumably would not have included transportation costs because there would have been no items to move. In other words, even under the terms of the letter, the parties did not contemplate, nor did they contract for, reimbursement of any auctioneer transportation costs. But the critical point here is that under their stipulation, the parties did not contemplate a second sale. Instead, to settle the Bairs' objection, the Trustee agreed to transport the Blackfoot items to Pocatello to be included in the Pocatello sale. Because the parties agreed there would be no Blackfoot auction, the provisions in the letter governing that sale, including the term allowing reimbursement of the auctioneer's expenses associated with holding that auction, are superfluous. Without a second auction, there were no associated auctioneer expenses.

In his recitations, the Trustee's attorney discussed transporting the Blackfoot items to Pocatello, but he made no mention of paying Prime Time more

MEMORANDUM OF DECISION - 12

than $2,000 in total sale expenses. As the Idaho courts caution, this Court should not "interpret an agreement to mean something that it does not say, nor interpolate into a contract something the contract does not itself contain." *Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 824 P.2d 841, 866 (Idaho 1992) (quoting *Nuquist v. Bauscher*, 227 P.2d 83, 87 (Idaho 1951)). *See also McCallum v. Campbell-Simpson Motor Co.*, 349 P.2d 986, 990 (Idaho 1960) ("Courts cannot make for the parties better agreements than they themselves have been satisfied to make, and by a process of interpretation relieve one of the parties from the terms which he voluntarily consented to . . . ."). There simply was no agreement to reimburse Prime Time for any additional expenses, and the parties' agreement cannot be interpreted to create such an obligation.

This may seem a harsh result, since presumably the Bairs benefitted from the single sale concept. It is not. Under the Code, it is the Chapter 7 trustee's responsibility to supervise all aspects of the liquidation of the debtor's assets. In performing that duty, the trustee (and his attorney) must clearly establish and document all relevant terms of a sale. Placing the burden of clarity in fixing an auctioneer's right to recover expenses on the trustee promotes this policy. In this case, time pressures notwithstanding, the Trustee elected to proceed with the auction even after it became apparent the Bairs disputed his position regarding

MEMORANDUM OF DECISION - 13

reimbursement of the auctioneer's transportation expenses. While it would have been problematic, the Trustee would have been justified in postponing the Pocatello auction until this issue, involving several thousand dollars, was resolved. As can be seen, risk attended the Trustee's decision to press on in the face of controversy without an order from the Court.

## CONCLUSION

The Bairs' objection to the Trustee's request to reimburse Prime Time for expenses for the Pocatello sale is well taken. The Trustee should be allowed to reimburse Prime Time for its costs in conducting the Pocatello auction up to the cap of $2,000, but no more. As noted above, since neither the Trustee nor Prime Time has filed a proper application for reimbursement of expenses in addition to those previously approved by the Court, no final order concerning this matter will be entered at this time.

Dated: February 15, 2005

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge